## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| GHADA SAYED HOSNY HASSAN BASYOUNY, as Personal Representative of the Estate of ASHRAF MOHAMED ABDEL-HALIM EL-TORKY, deceased, | |
| *Plaintiff,* | Case No.: |
| v. | |
| THE BOEING COMPANY, a Delaware Corporation, | |
| *Defendant.* | |

## COMPLAINT

Plaintiff, GHADA SAYED HOSNY HASSAN BASYOUNY, as Personal Representative of the Estate of ASHRAF MOHAMED ABDEL-HALIM EL-TORKY deceased ("Decedent") by her attorneys RAPOPORT WEISBERG & SIMS, P.C. and RAOUF WISSA, ESQ., states for her complaint against Defendant The Boeing Company ("Boeing") as follows:

## INTRODUCTION

1.     This lawsuit arises out of the crash of Ethiopian Airlines Flight 302 ("Flight 302"), a Boeing 737 MAX 8 aircraft with Aircraft Serial Number 62450 and registered as ET-AVJ, which crashed on March 10, 2019 at 05:44 UTC resulting in the deaths of all 157 onboard.

2.      Despite an intended life span of several decades, the subject Boeing 737 MAX 8 with Aircraft Serial Number 62450 crashed less than five months after it was delivered in November of 2018 and had only flown 1,330.3 hours before crashing.

3.      The crash of Flight 302 came less than five months after the crash of Lion Air Flight JT 610 ("Flight 610"), another Boeing 737 MAX 8 aircraft, which crashed on October 29, 2018 resulting in the deaths of all 189 onboard.

4.      Like the subject Boeing 737 MAX 8 with Aircraft Serial Number 62450, the Lion Air 737 MAX 8 with Aircraft Serial Number 43000 was virtually brand new, with only 895 hours of service life.

5.      Ongoing investigations into both the Lion Air and Ethiopian Airlines crashes indicate that prior to both crashes, Boeing's unreasonably dangerous and defectively designed and manufactured Maneuvering Characteristics Augmentation System (MCAS) activated, causing both sets of qualified pilots to lose control of nearly brand-new aircraft, fatally injuring themselves and everyone else on board.

6.      The loss of two nearly brand-new commercial aircraft piloted by qualified flight crews within a 5-month span is unprecedented.

7.      Publicly available information available to date suggests that Boeing either willful and wantonly, or worse, with intentionally calculated risks, rushed the 737 MAX 8 to market with unreasonably dangerous characteristics, including the MCAS, that emphasized profits over safety.

8.      Numerous other corporate management decisions by Boeing that emphasized profits over safety contributed to the crash of Flight 302, included: i)

designing an aircraft with an automated flight control system without any redundancy that was as a result susceptible to catastrophic failure in the event a single defective angle-of-attack (AOA) sensor sometimes referred to as an "A-vane"; ii) choosing not to properly inform pilots of the existence of the new flight control system, including MCAS; iii) choosing not to educate and train pilots in all aspects of the MCAS operation; iv) failing to properly address the new MCAS in the aircraft's flight manual; v) choosing not to include key safety features as standard rather than optional upgrades including, but not limited to, an angle-of-attack discrepancy alert system; vi) failing to ensure that the logic coding for the MCAS was free of coding errors; vii) delivering 737 MAX 8 aircraft with a version of the flight control system that was materially different from the version presented to the FAA during certification; and viii) failing to take appropriate action after Boeing learned that the 737 MAX 8 aircraft was not performing as intended or safely, as was already known by then to Boeing, but made tragically clear with the crash of Lion Air Flight JT 610.

9. The implementation of the unreasonably dangerous and defectively designed and manufactured MCAS in the Boeing 737 MAX line of aircraft was intended to make Boeing's outdated line of narrow-body aircraft more attractive when compared to the Airbus A320neo - a recently released and more fuel efficient narrow-body line of aircraft – by allowing Boeing to claim that the 737 MAX 8 was so similar to its earlier models that it did not require significant retraining for those pilots familiar with the older generations of 737s.

10.     In implementing the unreasonably dangerous and defectively designed and manufactured MCAS in the Boeing 737 MAX line of aircraft, Boeing misled the Federal Aviation Administration (FAA), its airline customers, flight crews operating its 737 MAX aircraft, its investors, and the general public.

11.     Despite being misled as to certain details of the 737 MAX 8, the FAA is also culpable[1] for the crash of Flight 302 because the FAA negligently hired and/or trained its employees, and it knew or should have known that its employees were unfit to perform their job duties and responsibilities, including implementing and executing inspections and testing of the 737 MAX 8; and that a catastrophic plane crash was a foreseeable consequence. Further, after the initial Lion Air Flight 610 crash, the FAA negligently, recklessly, and/or unlawfully provided incomplete and inadequate warnings to pilots, passengers, and the public that severely understated and downplayed the serious known safety risk associated with continued flight of the 737 MAX 8.

12.     Even after the crash of Lion Air 610 and the deaths of all 189 people aboard, Boeing slow-played what it knew about the unreasonably dangerous and defectively designed and manufactured MCAS in the Boeing 737 MAX line of aircraft, dragging its feet to reveal what it already knew about the dangerous nature of the MCAS.

---

[1] It is Plaintiff's intention to add the United States to this lawsuit as a defendant based on the actionable negligence of the FAA, after exhausting all administrative remedies.

## PARTIES

13.     Decedent Ashraf Mohamed Abdel-Halim El-Torky, was a passenger on board Flight 302 when it crashed on March 10, 2019 resulting in his death. Decedent is survived by his spouse, Ghada Sayed Hosny Hassan Basyouny, his daughter, Engy Ashraf Mohamed Abdel-Halim El-Torky, a minor; and his son, Mohamed Ashraf Mohamed Abdel-Halim El-Torky, a minor. Plaintiff is Ghada Sayed Hosny Hassan Basyouny. She brings this action as decedent's personal representative on his behalf and the behalf of his estate, heirs, survivors, and beneficiaries. She also brings this claim as the mother and personal representative and next friend of the deceased's minor children.  Plaintiff and her decedent were both citizens of the Arab Republic of Egypt where they maintained their principle and permanent residence.

14.     At all times herein mentioned, Defendant The Boeing Company is a Delaware corporation with its principal place of business in the State of Illinois. Boeing is, and at all relevant times was, registered with the Illinois Secretary of State as doing business in Illinois, and it does business in Illinois and this judicial district. Boeing is a multinational corporation involved in the design, manufacture, and sale of commercial aircraft used throughout the world.

15.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction based on complete diversity of citizenship pursuant to 28 U.S.C. § 1332.

5

17. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1369, commonly known as multiparty multiforum jurisdiction, as the crash of Ethiopian Airlines Flight 302 resulted in the deaths of more than 75 natural persons at a discrete location and Boeing is a resident of this district. Decisions by Boeing engineers and corporate officers that led directly to the crash of Flight 302 occurred at Boeing's International Headquarters in Chicago, Illinois.

## BACKGROUND FACTS

18. In 1964, during the first decade of the civil aviation jet age in the United States, the Boeing 737 was conceptualized as a lower-cost twin-engine passenger airliner derived from the four-engine Boeing 707 that had been introduced in 1958 and the three-engine Boeing 727 introduced in 1963. The 737 first entered service in 1968. When the Boeing 737 initially entered service, it was equipped with a pair of Pratt & Whitney JT8D engines, one mounted below each wing. The JT8D engine had a diameter of 42.5 inches and weighed approximately 4,741 lbs.

19. Development began in 1979 for the 737's first major revision. Boeing wanted to increase capacity and range, incorporating improvements to upgrade the aircraft to then-modern specifications, while also retaining commonality with previous 737 variants. In 1980, preliminary aircraft specifications of the variant, styled 737-300, were released at the Farnborough Airshow. The 737-300 was the first of what would become known as the 737 "Classic" variant.

20. Then-Boeing engineer, Mark Gregoire, led a design team, which cooperated with CFM International to select, modify and deploy a new engine and

nacelle that would make the 737-300 into a viable aircraft. They chose the CFM56-3B-1 high-bypass turbofan engine to power the aircraft, which yielded significant gains in fuel economy and a reduction in noise, but also posed an engineering challenge, given the low ground clearance of the 737 and the larger diameter of the engine over the original Pratt & Whitney engines as can be seen in these comparative photos:



CFM56-3B-1



JT8D

21. Boeing's engineering team solved the ground-clearance problem by working with CFM International to reduce the size of the fan (which made the engine

slightly less efficient than it had been forecast to be), placing the engine forward on the wing, and by moving engine accessories to the sides of the engine pod, giving the engine a distinctive non-circular "hamster pouch" air intake.

22.    The prototype 737-300, the 1,001st 737 built, first flew on February 24, 1984. The 737 "Classic" series, including the 737-300, 737-400, and 737-500 series would continue development through 1987.

23.    Prompted by the release into service of the then-new Airbus A320 in 1988, Boeing initiated development of an updated series of 737 aircraft in 1991. After working with potential customers, the 737 Next Generation (NG) program was announced on November 17, 1993. The 737 NG encompasses the -600, -700, -800, and -900 equipped with new, quieter, more fuel-efficient CFM56-7B engines. The first 737 NG to enter service was on December 17, 1997.

24.    As demands for commercial aviation continued to increase in the 2000s, so did the price of jet fuel, which reached a peak in 2008, when airlines were devoting approximately 40% of the retail price of an air ticket to pay for fuel, versus 15% in 2000. Consequently, in that year carriers retired Boeing 737-Classic series aircraft to reduce fuel consumption. Replacement aircraft consisted of more efficient 737 NGs or aircraft from Boeing's main narrow-body competitor Airbus, including the Airbus A320/A319/A318 series aircraft. On June 4, 2008, United Airlines announced it would retire all 94 of its 737-Classic aircraft (sixty-four 737-300 and thirty 737-500 aircraft), but replacing them with Airbus A320 jets taken from its "Ted" subsidiary, which had been shut down.

8

25.     On December 1, 2010, Boeing's main competitor, Airbus, announced the A320neo ("New Engine Option") family of aircraft, estimated to have 15% increased fuel efficiency compared to other models, paving the way for Airbus to gain a serious competitive advantage over Boeing in the "narrow-body" commercial aircraft market.

26.     Less than 3 months later, Boeing's chief executive of its commercial airplanes division, James Albaugh, told employees at a meeting in January 2011 that Airbus' decision to redesign its existing aircraft with larger engines would be "a design change that will ripple through the airplane" and present significant challenges for Boeing. That same month, Boeing Chair and CEO James McNernery announced that Boeing was inclined to wait and design an entirely new narrow-body aircraft to compete with the A320neo, rather than put engines that were too big on the 737 line of aircraft. He stated: "We're going to do a new airplane."

27.     In June of 2011, at the Paris Air Show, the Airbus A320neo set an order record for a new commercial airliner, gathering 667 commitments for a total Airbus backlog of 1,029 units since the launch of the A320neo. Airbus won approximately $72.2 billion of contractual commitments for a total of 730 aircraft, setting a new all-time record for sales by commercial airframe manufacturers at air shows. In the first two days of the show, Airbus sold $26 billion worth of aircraft, compared to just $16 billion in the same two days for Boeing.

28.     In July of 2011, American Airlines announced an order for 460 narrow-body commercial aircraft, including 260 of the newest Airbus A320neo aircraft. This order broke Boeing's monopoly with American Airlines, which was the world's largest

airline. Soon thereafter, Boeing changed directions and began development of what would eventually become the Boeing 737 MAX series.

29.     It was in August of 2011 that Boeing announced it had changed direction from just a few months before and planned to launch a new engine variant of the 737 powered by the CFM International LEAP-1B engines. Utilizing an older plane design and avoiding an entirely "new plane" avoided a lengthy certification process, as well as expensive new pilot training that would be necessary for a new aircraft type, a cost that would have had to be shouldered by Boeing's airline customers and would impact sales.

30.     The LEAP-1B engines have a height of 88.8 inches with a dry weight of 6,100 lbs. By comparison, the prior-equipped CFM56-7 series were smaller, at 72.0 inches tall with a dry weight of approximately 5,300 lbs.

31.     In order to make the larger diameter and heavier engine fit under the low-slung 737 wing, Boeing engineers relocated the engine so that it was higher off of the ground. However, the only way to do this was to move it forward on the airplane as shown below:



32.     This, in turn, changed the aerodynamics and handling characteristics of the entire aircraft, including the manner in which the aircraft performed at a high angle of attack, such as takeoff. In order to counter-balance these new intrinsic handling characteristics, Boeing designed the Maneuvering Characteristics Augmentation System (MCAS), which took the controls away from the pilots and pushed the aircraft nose down when a high angle of attack was detected.

33.     The MCAS relies on data from a single angle of attack sensor to move the horizontal stabilizer, causing the aircraft to nose down.

34.     The MCAS was designed to rely on only one of the two angle-of-attack sensors at a time. Despite the ability of the MCAS to take away control of flight control surfaces, Boeing decided the angle-of-attack reading was not critical for safe operation, and as such, an angle-of-attack "disagree-alert" system was only offered as an optional item with an upcharge to airline customers.

35.     Because the MCAS was intentionally designed to operate in the background without pilot knowledge, Boeing did not inform pilots that the MCAS existed. The MCAS was not disclosed in the aircraft's flight manual. Pilots would only learn indirectly about the MCAS when the plane began automatically fighting their pitch commands, often at low altitudes with little time to react.

36.     A Boeing engineer involved with the design of the 737 MAX, Rick Ludtke, has publicly stated about the 737 MAX development: "[a]ny designs we created could not drive any new training that required a simulator." This created a chaotic environment for engineers, as Ludtke described: "The company was trying to

avoid costs and trying to contain the level of change. They wanted the minimum change to simplify the training differences, minimum change to reduce costs, and to get it done quickly."

37.     In its rush to get the 737 MAX 8 certified and orders filled to airlines, Boeing leadership irresponsibly placed enormous pressure on its engineers to produce a flyable finished product. The New York Times interviewed several of the engineers and designers working on the 737 MAX, who described this pace of the 737 MAX development:

    a.   An engineer working on the 737 MAX described how "[t]he timeline was extremely compressed . . . It was go, go, go."

    b.   A former designer working on the 737 MAX's flight controls described how the design team had at times produced 16 technical drawings a week, double the normal rate. The designer understood the message from management to be: "We need something now."

    c.   A technician who assembled wiring on the 737 MAX said that he received sloppy blueprints in the first few months of development and was told that the instructions for the wiring would be cleaned up later in the process. However, his internal assembly designs for the 737 MAX apparently still include omissions today, such as not specifying which tools to use to install a certain wire, a situation that could lead to a faulty connection. This is quite different from standard procedures because normally such blueprints include intricate instructions.

38.     In September of 2012, the Boeing 737 MAX series was first offered for sale to customers.

39.     In November of 2015 the first 737 MAX rolled out of the Boeing factory. It was completed years quicker than if Boeing had redesigned an entirely new narrow-body aircraft to compete with the Airbus A320neo.

40.     On January 29, 2016, the first Boeing 737 MAX 8 model completed a test flight.

41.     On March 8, 2017, the FAA certified the 737 MAX series.

42.     On May 6, 2017, the first 737 MAX series aircraft was delivered to the first customers.

43.     As part of its ongoing marketing efforts, Boeing repeatedly represented to its customers and pilots that the 737 MAX did not require extensive retraining from the 737 NG, with some pilots reporting less than an hour of training on an iPad regarding the differences between the 737 MAX and the 737 NG. The MCAS was not discussed during this training.

44.     On June 22, 2017, Boeing announced record aircraft sales at the Paris Air Show, almost entirely due to the 737 MAX, as depicted in the below-tweet from Boeing. On information and belief, by this time Boeing was already well-aware that there were logic coding errors in the 737 MAX 8 aircraft, but concealed this fact from its customers, the FAA, pilots, and the general public.



45.     On October 29, 2018, Lion Air Flight 610 crashed into the Java Sea 12 minutes after takeoff. A preliminary report from the Indonesian Komite Nasional Keselamatan Transportasi (KNKT) revealed that the MCAS pushed the plane's nose down 26 times in 10 minutes.

46.     Shortly after takeoff, the pilots of Lion Air Flight 610 complained of flight control issues as the plane repeatedly pitched down despite the pilots' efforts to climb. The pilots reported unreliable airspeed and altitude readings. In the audio recordings from the cockpit, the rattle of a stick shaker can be heard, a device used to alert pilots of a potential stall, which can occur when a plane ascends too quickly, or when the flight control system believes the plane is ascending too quickly, such as when the data feeding AOA sensor provides incorrect data. The pilots of Lion Air Flight 610 requested permission to return to Jakarta, which was granted, but they were unable to control the aircraft.

14

47.     The preliminary reports regarding the cockpit voice recording from the Lion Air wreckage reveal that while the plane remained uncontrolled, one of the pilots flipped through a technical manual in an attempt to identify the problem while the other pilot prayed. The pilots appeared unaware of the MCAS and its potential role in overriding their manual controls.

48.     On November 7, 2018, the FAA issued an Emergency Airworthiness Directive identifying the potential danger presented by the flight control system, but not providing clear instructions on what pilots should do in the event of an AOA sensor failure:

> "This AD was prompted by analysis performed by the manufacturer showing that if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer. We are issuing this AD to address this potential resulting nose-down trim, which could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down altitude, significant altitude loss, and possible impact with terrain."

49.     On and prior to November of 2018, several pilots made anonymous reports to the federal government through the Aviation Safety Reporting System ("ASRS").

50.     ASRS is an FAA voluntary and confidential reporting system that allows aircraft crew members to confidentially report near misses and close calls in the interest of improving air safety. ASRS collects aviation safety incident reports in order to lessen the likelihood of aviation accidents. ASRS will then issue alerts to relevant parties, including manufacturers like Boeing, if it feels it is necessary to

improve safety. ASRS also maintains an online database of reports that is accessible by anyone, including Boeing.

51.     Within days of the Emergency AD, a Boeing 737 MAX 8 pilot made the following submission to ASRS – which upon information and belief was either reported to Boeing, reviewed by Boeing on the public database, or both:

> "The recently released 737 MAX8 Emergency Airworthiness Directive directs pilots [on] how to deal with a known issue, but it does nothing to address the systems issues with the AOA [angle of attack] system.
>
> MCAS (Maneuvering Characteristics Augmentation System) is implemented on the 737 MAX to enhance pitch characteristics with flaps UP and at elevated angles of attack. The MCAS function commands nose down stabilizer to enhance pitch characteristics during steep turns with elevated load factors and during flaps up flight at airspeeds approaching stall. MCAS is activated without pilot input and only operates in manual, flaps up flight. The system is designed to allow the flight crew to use column trim switch or stabilizer aisle stand cutout switches to override MCAS input. The function is commanded by the Flight Control computer using input data from sensors and other airplane systems.
>
> The MCAS function becomes active when the airplane angle of attack exceeds a threshold based on airspeed and altitude. Stabilizer incremental commands are limited to 2.5 degrees and are provided at a rate of 0.27 degrees per second. The magnitude of the stabilizer input is lower at high Mach number and greater at low Mach numbers. The function is reset once angle of attack falls below the angle of attack threshold or if manual stabilizer commands are provided by the flight crew. If the original elevated AOA condition persists, the MCAS function commands another incremental stabilizer nose down command according to current aircraft Mach number at actuation.
>
> This description is not currently in the 737 Flight Manual Part 2, nor the Boeing FCOM, though it will be added to them soon. This communication highlights that an entire system is not described in our Flight Manual. This system is now the subject of an AD.
>
> I think it is unconscionable that a manufacturer, the FAA, and the airlines would have pilots flying an airplane without adequately training, or even providing available resources and sufficient documentation to understand the highly complex systems that differentiate this aircraft from prior models. The fact that this airplane

requires such jury rigging to fly is a red flag. Now we know the systems employed are error prone--even if the pilots aren't sure what those systems are, what redundancies are in place, and failure modes.

I am left to wonder: what else don't I know? The Flight Manual is inadequate and almost criminally insufficient. All airlines that operate the MAX must insist that Boeing incorporate ALL systems in their manuals."

52.    In November of 2018 – less than a month after the Lion Air Flight 610 crash and approximately four months before the crash of Ethiopian Airlines Flight 302 - the Allied Pilots Association, the union for American Airlines pilots, confronted Boeing about the new features to the 737 MAX. During the heated confrontation, one pilot is heard telling the Boeing executives, including Boeing vice president Mike Sinnett, regarding the lack of knowledge regarding the MCAS: "We flat out deserve to know what is on our airplanes." Another pilot is heard explaining: "We're the last line of defense to being in that smoking hole. And we need the knowledge."

53.    On or around November of 2018, Boeing finally revealed to the FAA and some of its customers that it had already known as early as 2017 that an intended display function known as the "AOA Disagree Alert" had been erroneously programmed such that it was not functioning properly on 737 MAX 8 aircraft. Boeing concealed this admission from the public until May 5, 2019, well after the crash of Ethiopian Airlines Flight 302.

54.    On March 10, 2019, Ethiopian Airlines Flight 302 began to experience flight control problems within one minute of having taken off. Preliminary investigation materials reveal the plane was accelerating abnormally and oscillating

up and down, consistent with an MCAS malfunction. Shortly thereafter, Flight 302 impacted terrain killing all of the 157 people aboard.

55. In April of 2019, after both crashes but before Boeing revealed to the public what it had revealed to its airline customers and the FAA about the secretly known errors in the logic coding, Boeing CEO Dennis Muilenberg spoke at the Boeing stockholders meeting, denying that the two recent crashes of the 737 MAX aircraft were due to any "technical slip" by Boeing. Rather, Muilenberg falsely stated: "There is no technical slip or gap here." This false statement to the stockholders and the public is evidence Boeing's decision to use a flight control system without any redundancy system and knowingly faulty logic coding was a consciously calculated decision.

## COUNT I - THE BOEING COMPANY
### Negligence/Willful & Wanton Conduct

56. Plaintiff incorporates all of the above paragraphs as if set forth fully herein.

57. At all relevant times, Boeing was the designer, manufacturer, distributor and/or seller of the Boeing 737 MAX 8 line of aircraft, in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable and safe for passenger air transportation, including those 737 MAX 8 aircraft involved in the crash of Flight 610 and Flight 302, and owed a duty of care to conduct itself in a reasonably safe manner in the design, development, manufacture, distribution and sale of the Boeing 737

MAX 8 line of aircraft, including the aircraft involved in the crash of Flight 610 and Flight 302.

58.     Notwithstanding said duties of care, Boeing committed the following negligent and/or willful and wanton acts or omissions:

a. Choosing to design, develop, manufacture, and sell the 737 MAX 8 line of aircraft with a flight control system capable of overriding pilot commands and designed without any redundancy system;

b. Choosing to design, develop, manufacture, and sell the 737 MAX 8 line of aircraft with a flight control system capable of overriding pilot commands without any standard features warning pilots of an erroneous system activation;

c. Manufacturing the 737 MAX 8 line of aircraft with a flight control system with logic coding that contained coding errors;

d. Choosing to design, develop, manufacture, and sell the 737 MAX 8 line of aircraft while concealing the existence of the MCAS in order to increase revenues and market share of international narrow-body aircraft sales;

e. Choosing not to provide customers or pilots with warnings about the existence or risks associated with the MCAS;

f. Choosing not to promptly develop or push out a software patch for the logic coding errors known to exist as early as 2017 as such acknowledgement of design errors would have jeopardized consumer confidence and/or investor confidence in the Boeing 737 MAX 8 line or aircraft;

g. Choosing to conceal from customers and pilots the known existence of logic coding errors in the MCAS; and,

h. Choosing to advance a corporate culture that emphasized development speed and profits over safety, knowing that the proliferation of such corporate culture would drive enormous corporate profits but significantly increase the risk of an aviation disaster resulting in catastrophic loss of life.

59.     As a direct and proximate result of the above-referenced acts and/or omissions, the Decedent suffered pre-impact injury, terror, and death.

60.     As a direct and proximate result of the above-referenced acts and/or omissions, Plaintiff and Decedent's next-of-kin have suffered and continue to suffer loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Decedent, as well as other pecuniary injuries including grief, sorrow, and mental suffering, in addition to loss of financial support, loss of household services, funeral expenses and/or related counseling expenses.

61.     Decedent's estate and next of kin are entitled to compensatory damages.

62.     Boeing's conduct as described above was committed willfully, wantonly, with oppression, fraud, malice, and a knowing and conscious disregard for the rights of others and safety of passengers and flight crews aboard aircraft it manufactured such that the imposition of punitive damages would be both equitable and just to not only deter Boeing, but others from engaging in such type of conduct.

## COUNT II – THE BOEING COMPANY
### Strict Product Liability

63.     Plaintiff incorporates all of the above paragraphs as if set forth fully herein.

64.     At the time the subject aircraft left the control of Boeing, the aircraft was defective in design and as manufactured with regard to its acknowledged intended and foreseeable uses as set forth in the preceding paragraphs.

65.     As a direct and proximate result of the above-referenced unreasonably dangerous conditions of the aircraft, the Decedent suffered pre-impact injury, terror, and death.

66.     As a direct and proximate result of the above-referenced unreasonably dangerous conditions of the aircraft, Plaintiff and Decedent's next-of-kin have suffered and continue to suffer loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Decedent, as well as other pecuniary injuries including grief, sorrow, and mental suffering, in addition to loss of financial support, loss of household services, funeral expenses and/or related counseling expenses.

67.     Decedent's estate and next of kin are entitled to compensatory damages.

68.     Boeing's conduct leading to the design and manufacture of the aircraft with such unreasonably dangerous conditions as described above was committed willfully, wantonly, with oppression, fraud, malice, and a knowing and conscious disregard for the rights of others and safety of passengers and flight crews aboard aircraft it manufactured such that the imposition of punitive damages would be both equitable and just to not only deter Boeing, but others from engaging in such type of conduct.

## COUNT III – THE BOEING COMPANY
### Breach of Warranty

69.     Plaintiff incorporates all of the above paragraphs as if set forth fully herein.

70.     Prior to the crash of Flight 302, Boeing expressly and/or impliedly warranted and represented that the subject 737 MAX 8 aircraft, including its component parts and instruments, and in conjunction with the instructions and warnings given by Boeing, was airworthy, of merchantable quality, both fit and safe for the purpose of commercial air travel for which it was designed, intended and used. Additionally, Boeing further warranted that the subject aircraft, and its component parts, was free from all defects.

71.     Boeing breached said warranties in that the subject aircraft was not airworthy, of merchantable quality, or fit and safe for the purposes for which it was designed, intended and used, and free from all defects as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to Ethiopian Airlines.

72.     Decedent, as a passenger of Flight 302, was an intended third-party beneficiaries of Boeing's warranties that the subject 737 MAX 8 aircraft was airworthy, of merchantable quality, both fit and safe for the purposes for which it was designed, intended and used, and free from all defects.

73.     Decedent reasonably relied on these warranties to his detriment.

74.     As a direct and proximate result of the breaches of these warranties, the Decedent suffered pre-impact injury, terror, and death.

75.     As a direct and proximate result of the breaches of these warranties, Plaintiff and Decedent's next-of-kin have suffered and continue to suffer loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or

moral support from Decedent, as well as other pecuniary injuries including grief, sorrow, and mental suffering, in addition to loss of financial support, loss of household services, funeral expenses and/or related counseling expenses.

76.     Decedent's estate and next of kin are entitled to compensatory damages.

77.     Boeing's breaches of these warranties was committed willfully, wantonly, with oppression, fraud, malice, and a knowing and conscious disregard for the rights of others and safety of passengers and flight crews aboard aircraft it manufactured such that the imposition of punitive damages would be both equitable and just to not only deter Boeing, but others from engaging in such type of conduct.

## COUNT IV – THE BOEING COMPANY
### Common Law Fraud

78.     Plaintiff incorporates all of the above paragraphs as if set forth fully herein.

79.     Prior to the crash of Flight 302, Boeing engaged in deceptive acts and practices as described above in the design, development, marketing, and sale of the 737 MAX 8 aircraft.

80.     It was at all times the intention of Boeing that airline customers and their passengers rely on Boeing's deception that its 737 MAX 8 aircraft were safe for use and free from defects.

81.     Boeing's deception occurred in the course of conduct involving the design, development, marketing and sale of the 737 MAX 8 aircraft.

82.     The airlines and their passengers, including the Decedent, relied on Boeing's deception that the 737 MAX 8 aircraft were safe for use and free from defects.

83.     As a direct and proximate result of this deception, the Decedent suffered pre-impact injury, terror, and death.

84.     As a direct and proximate result of this deception, Plaintiff and Decedent's next-of-kin have suffered and continue to suffer loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Decedent, as well as other pecuniary injuries including grief, sorrow, and mental suffering, in addition to loss of financial support, loss of household services, funeral expenses and/or related counseling expenses.

85.     Boeing's deception was committed willfully, wantonly, with scienter, oppression, fraud, malice, and a knowing and conscious disregard for the rights of others and safety of passengers and flight crews aboard aircraft it manufactured such that the imposition of punitive damages would be both equitable and just to not only deter Boeing, but others from engaging in such type of conduct.

## COUNT V – THE BOEING COMPANY
### Statutory Cause of Action - Illinois Consumer Fraud and Deceptive Business Practices Act – 815 ILCS 505/1 *et seq.*

86.     Plaintiff incorporates all of the above paragraphs as if set forth fully herein.

87.     There was in force at the time of the sale of subject Boeing 737 MAX 8 aircraft, a certain statute in the state of Illinois known as the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq.

88.     Under Section 2 of the Consumer Fraud and Deceptive Business Practice Act, "unfair or deceptive acts or practices" are defined to include the use of

deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact in the conduct of any trade or commerce.

89.     Section 10a of the act states in pertinent part:

"Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages **or any other relief which the court deems proper**; provided, however, that **no award of punitive damages may be assessed under this Section against a party defendant who is a new vehicle dealer or used vehicle dealer within the meaning of Chapter 5 of the Illinois Vehicle Code [625 ILCS 5/5-100 et seq.] or who is the holder of a retail installment contract within the meaning of Section 2.12 of the Motor Vehicle Retail Installment Sales Act [815 ILCS 405/2.12],** unless the conduct engaged in was willful or intentional and done with evil motive or reckless indifference to the rights of others…"

90.     The Illinois Consumer Fraud and Deceptive Business Practices Act thus expressly lists punitive damages as within the scope of "any other relief" as it excludes such punitive damages in the context of certain automobile dealers, but not other defendants, including aircraft designers, developers, markets, manufacturers, and sellers such as Boeing.

91.     Even if Boeing were deemed to be a "new vehicle dealer" within the meaning of this statute, punitive damages are expressly authorized because in this case Boeing's conduct "was willful or intentional and done with evil motive or reckless indifference to the rights of others."

92.     At all relevant times, Boeing represented to its airline customers and the general public that its line of 737 MAX 8 aircraft were safe for use and free from defects, with the intent that such representations be relied upon.

93.     In violation of Section 2 of the Consumer Fraud and Deceptive Business Practice Act, Boeing engaged in unfair or deceptive acts including deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of material fact, including those described above as related to the development and concealment of the MCAS, with intent that others rely upon the concealment, suppression or omission of such material fact in the conduct of any trade or commerce.

94.     As a direct and proximate result of this statutory violation, the Decedent suffered pre-impact injury, terror, and death.

95.     As a direct and proximate result of this statutory violation, Plaintiff and Decedent's next-of-kin have suffered and continue to suffer loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Decedent, as well as other pecuniary injuries including grief, sorrow, and mental suffering, in addition to loss of financial support, loss of household services, funeral expenses and/or related counseling expenses.

96.     Decedent's estate and next of kin are entitled to compensatory damages.

97.     Boeing's statutory violation was committed willfully, wantonly, with oppression, fraud, malice, and a knowing and conscious disregard for the rights of others and safety of passengers and flight crews aboard aircraft it manufactured such

that the imposition of punitive damages would be both equitable and just to not only

deter Boeing, but others from engaging in such type of conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendant:

A.  For compensatory damages in an amount according to proof at trial;

B.  For punitive damages in an amount according to proof at trial;

C.  For reasonable attorneys' fees associated with the prosecution of this matter;

D.  For all costs of suit incurred;

E.  For interest upon any judgment entered as provided by the law; and

F.  For such other and further relief as the court may deem just and proper.

### PLAINTIFF DEMANDS TRIAL BY JURY

Respectfully submitted,

PLAINTIFF,


By: /s/ David E. Rapoport
          One of Plaintiff's attorneys

David E. Rapoport
Matthew S. Sims
**RAPOPORT WEISBERG & SIMS, P.C**
20 North Clark St., Suite 3500
Chicago, IL 60602
Telephone: (312) 327-9880
Facsimile: (312) 327-9881
drapoport@rapoportlaw.com
msims@rapoportlaw.com

27

&

Raouf Wissa, Esq.
c/o **RAPOPORT WEISBERG & SIMS, P.C**
20 North Clark St., Suite 3500
Chicago, IL 60602
Telephone: (312) 327-9880
Facsimile: (312) 327-9881
raoufwissaesq@gmail.com